**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 1 2005**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

SHAWN TYWAN SOLOMON,

Defendant-Appellant.

No. 04-5063

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 03-CR-78-H)**

Kevin D. Adams, Tulsa, Oklahoma, for Appellant.

Leena Alam, Assistant United States Attorney (David O'Meilia, United States
Attorney, Northern District of Oklahoma, with her on the brief) Tulsa, Oklahoma,
for Appellee.

Before **O'BRIEN** , **HOLLOWAY** , and **TYMKOVICH** , Circuit Judges.

**TYMKOVICH** , Circuit Judge.

A jury in the Northern District of Oklahoma found Shawn Tywan Solomon

guilty on one count each for possession of cocaine with intent to distribute under

21 U.S.C. § 841(a) and (b) (Supp. 2004), possession of a firearm in furtherance of

a drug trafficking crime under 18 U.S.C. § 924(c) (2000), and felon in possession of a firearm under 18 U.S.C. §§ 922(g) (2000) and 924(a) (Supp. 2004). Solomon argues on appeal that his constitutional rights were violated in three ways: (1) the admission of hearsay statements at trial violated his Sixth Amendment right to confrontation; (2) the exclusion of certain photographs of injuries he received in an unrelated assault denied him the due process and compulsory process right to present a defense; and (3) the combination of the above-mentioned errors denied him a fundamentally fair trial.

Finding no constitutional violations, we AFFIRM.

## I. BACKGROUND

On March 10, 2003, Officer Dianna Liedorff of the Tulsa Police Department noticed a black Lexus parked on the wrong side of the road, facing oncoming traffic. A female sat in the driver's seat. Shawn Tywan Solomon came out of a nearby house and entered the passenger side of the car, which then departed. Officer Liedorff followed the Lexus and, after several blocks, initiated a traffic stop because the Lexus was exceeding the posted speed limit. After stopping the Lexus, Officer Liedorff approached the passenger side of the vehicle where Solomon was seated. Solomon would not make eye contact, was breathing rapidly, and seemed "nervous."

Officer Liedorff obtained the female's driver's license and returned to her patrol car. While in her patrol car, Officer Liedorff noticed that Solomon was repeatedly bending and moving inside the car. Using her speaker, she instructed both passengers to place their hands on the roof of the car. Although initially complying with Officer Liedorff's instructions, Solomon began dropping down his right hand out of sight. Officer Liedorff repeated her instructions three times, and each time Solomon again dropped his hand. Concerned by Solomon's movements, Officer Liedorff called for backup, and Officer Jake Kelley arrived shortly thereafter.

Officers Liedorff and Kelley approached the passenger side of the car together and asked Solomon to step out. Solomon did not immediately comply, and so, concerned for her safety, Officer Liedorff placed handcuffs on Solomon while he remained seated in the car. Solomon was then helped from the car and patted down by Officer Kelley, who found a loaded semiautomatic handgun in Solomon's waistband and a piece of crack cocaine that fell from his pant leg. Officer Kelley also found $278 on Solomon's person spread out among three different pockets.

While Officer Kelley detained Solomon, Officer Liedorff escorted the driver of the Lexus to the patrol car for questioning. She asked the driver whether any of the drugs belonged to her, and the driver said "no." Officer

Liedorff also asked whether there was any other contraband in the car, and the driver "indicated that there was a blue tin [in the car]." R.O.A., VI at 39. Officer Liedorff relayed this information to Officer Kelley, who in turn located the blue tin in the door pocket on the passenger side of the Lexus. Inside the blue tin was over four grams of crack cocaine and an Exacto knife. No other drug paraphernalia was found in the car or on Solomon's person.

At trial, the government used testimony by Harold Adair, a sergeant assigned to the Special Investigations Division, to establish that Solomon possessed the crack cocaine for the purpose of distribution rather than personal use. Adair contrasted indicia of personal drug use with indicia of distribution. Specifically, he testified that simple users of crack cocaine do not carry more than one or two "rocks" at a given time, while dealers typically carry approximately five grams. While users are typically found with drug paraphernalia such as glass or metal pipes, dealers are not. While users typically do not carry cash, dealers typically have significant amounts, in small bills, and spread around in multiple pockets. While users rarely carry weapons, dealers almost always have weapons. And finally, Adair testified that dealers frequently store their cocaine base with a razor blade or Exacto knife which allows them to cut the rocks into smaller pieces for distribution.

Another set of facts that bears on our disposition of this case occurred approximately one week prior to Solomon's traffic encounter with Officers Liedorff and Kelley. On the morning of March 4, 2003, Solomon was assaulted while at a night club in Tulsa. Following the assault, friends escorted Solomon to his grandmother's house where he was living. Solomon's grandmother testified at trial that "he had lacerations throughout his head, some were bleeding very badly" and that "he had a huge hematoma in the forehead around the size of my fist." R.O.A., VII at 169. In an attempt to establish that Solomon carried the firearm because he feared for his safety, and not because he was involved in drug distribution, at trial Solomon's counsel sought to introduce photographs of Solomon's injuries that were taken shortly after the assault. The district court, finding the photographs not relevant to the charged crimes, ruled that the photographs were inadmissible.

## II. ANALYSIS

On appeal, Solomon does not dispute that he was a felon in possession of a firearm under 18 U.S.C. §§ 922(g) and 924(a). He does, however, challenge his convictions under 21 U.S.C. § 841(a) and (b) (possession of cocaine with intent to distribute) and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime). Solomon asks for a new trial on these counts due to the alleged constitutional violations discussed below.

## A. Confrontation Clause and Hearsay Evidence

Solomon first contends that the district court improperly admitted hearsay statements by Officer Liedorff in violation of the Confrontation Clause of the Sixth Amendment.[1] On direct examination, Officer Liedorff described the conversation she had with the driver while seated in the patrol car. Solomon ascribes error to the following colloquy:

Q: And when you asked the passenger to sit in your car, did you have a conversation with her?

A: Yes, . . .

Q: And what was the purpose of that conversation?

A: To determine whether she was involved, how she knew him, if she was involved with drugs, and to cut her loose if she wasn't, to get rid of her and her traffic violation so I could deal with Mr. Solomon.

Q: What specifically did you ask her?

A: *I asked her if any of the drugs were hers. She said no.* I asked her if—

Defense counsel: Objection, Your Honor.

The Court: Overruled. Go ahead.

---

[1] "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; *to be confronted with the witnesses against him*; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence." U.S. Const. amend. VI (emphasis added).

Q:     What did you ask her specifically after that?

A:     *I asked her if there was anything else of his in the vehicle. And she indicated that there was a blue tin.*

> Defense counsel:     Your Honor, once again, we are objecting to anything . . . that the driver said as hearsay.

> The Court:     Right for now, we'll just wait for it to be linked up later. Go ahead.

R.O.A., VI at 39.

The government argues that the above-quoted language was not hearsay because it was offered for the limited purpose of explaining why Officer Kelley searched the Lexus. Aple. Op. Br. at 8. We disagree. Having located a firearm and a piece of crack cocaine on Solomon's person, Officer Kelley had probable cause to search the Lexus for additional contraband. The record shows, in fact, that Officer Kelley had already started to search the Lexus before Officer Liedorff alerted him to the existence of the blue tin. R.O.A., VI at 38. Thus, in our view, Officer Liedorff's statements constituted inadmissable hearsay under the Federal Rules of Evidence. *See* Fed. R. Evid. 801(c) (hearsay is an out-of-court statement offered to prove the truth of the matter asserted).

The Supreme Court has recently held that the Confrontation Clause prohibits such testimonial out-of-court statements unless the declarant is shown to be unavailable and the defendant had an earlier opportunity to cross-examine the

declarant.[2]  *Crawford v. Washington*, —U.S.—, 124 S. Ct. 1354, 158 L.Ed.2d 177 (2004).  Testimonial hearsay includes "custodial examinations" and "[s]tatements taken by police officers in the course of interrogations."  *Id.* at 1364.  Here, there was no showing by the government that the driver was unavailable, nor did Solomon have a prior opportunity to cross-examine the driver.  Thus, under *Crawford*, the district court should not have admitted the driver's out-of-court statements.

Nevertheless, Solomon did not object on Sixth Amendment grounds, and "where a Confrontation Clause objection is not explicitly made below we will not address the constitutional issue in the absence of a conclusion that it was plain error for the district court to fail to raise the constitutional issue *sua sponte*." *United States v. Perez*, 989 F.2d 1574, 1582 (10th Cir. 1993) (en banc).  To meet this plain error standard, Solomon must show that the *constitutional* error (1) was

---

[2] The *Crawford* decision marks a fundamental shift in the Supreme Court's Confrontation Clause jurisprudence.  Under the pre-*Crawford* rule, a criminal defendant's right to confront a witness did not bar the admission of an unavailable witness's statements as long as those statements bore "adequate indicia of reliability," a test met when the evidence either fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Ohio v. Roberts*, 448 U.S. 56, 66 (1980).  *Crawford* was decided on March 8, 2004, approximately two months after Solomon's January 2004 trial.  Nevertheless, *Crawford* applies to our analysis because Solomon's case is on direct review.  *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) (new rules regarding the conduct of criminal prosecutions are to be applied retroactively to all cases pending on direct review).

obvious, and (2) affected substantial rights. *Id.* at 1583 (citations and quotations omitted). This standard does not apply, however, where the defendant has failed to argue on appeal that the district court committed plain error in not raising the constitutional issue *sua sponte*, as Solomon has failed to do here. *United States v. LaHue*, 261 F.3d 993, 1009 (10th Cir. 2001). We therefore deem the issue waived.

In the absence of plain error, we are left to review only the hearsay objection, which we review under the nonconstitutional harmless error standard. *Perez*, 989 F.2d at 1582. A nonconstitutional harmless error "is one that does not have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to whether it had such effect." *LaHue*, 261 F.3d at 1009 (citation and quotation omitted); *see also Kotteakos v. United States*, 328 U.S. 750, 765 (1946). Thus, where there is an abundance of evidence regarding the defendant's guilt, the nonconstitutional error will be deemed harmless. *See, e.g., United States v. Jefferson*, 925 F.2d 1242, 1255 (10th Cir. 1991).

Solomon contends that admission of the driver's out-of-court statements was not harmless. He argues that a central issue at trial was whether Solomon possessed the firearm "in furtherance of" a drug trafficking crime, as required for conviction under 18 U.S.C. § 924(c), and whether he "intended to distribute" the crack cocaine found in his possession, as required for conviction under 21 U.S.C.

§ 841(a). Solomon argues that without the driver's statements, the government could not tie him to the blue tin and its contents, and, in fact, "a reasonable inference could be drawn that the [blue tin] belonged to the owner of the Lexus and that she had given Mr. Solomon the crack that he possessed." Aplt. Op. Br. at 14. Having reviewed the evidence in the record, we disagree.

Even without the driver's statements, there was ample evidence tying Solomon to the blue tin: Solomon appeared nervous when pulled over; Officer Liedorff saw him dipping his hands as if he was hiding something; he continued to dip his hands even after Officer Liedorff instructed him three times to place them on the roof of the car; Officer Kelley found the blue tin in the passenger side door pocket closest to Solomon; and a piece of crack cocaine matching the contents of the blue tin fell from his pants. In addition, the jury heard evidence that Solomon was carrying a loaded handgun, had large sums of cash distributed among several pockets, and that no other drug paraphernalia was found in the car or on Solomon's person—all factors identified by the government's expert witness as indicia of drug distribution rather than drug use.

Thus, because there was an abundance of evidence other than the driver's out-of-court statements from which a jury could have reached the conclusion that the blue tin belonged to Solomon, we find that the admission of the driver's statements into evidence was harmless.

**B. Right to Present a Defense**

Solomon next argues that the photographs taken after an assault were relevant to his intent in possessing the firearm found by Officer Kelley during the pat down. According to Solomon, by viewing the photographs of his injuries, a jury could reasonably conclude that he was still suffering the psychological effects of the assault and that his intent in carrying the firearm was therefore not to further a drug trafficking crime, *see* 18 U.S.C. § 924(c), but rather to provide protection in the event his attackers returned. The district court's exclusion of the photographs, according to Solomon, denied him the right to present a defense.

The district court has broad discretion in determining the admissibility of evidence. *United States v. Bautista*, 145 F.3d 1140, 1151 (10th Cir. 1998). We therefore review a district court's decision to exclude evidence for abuse of discretion. *United States v. Ramone*, 218 F.3d 1229, 1234 (10th Cir. 2000). The question of whether a constitutional violation has occurred is reviewed de novo. *Id.; see also United States v. Wooten*, 377 F.3d 1134, 1141 (10th Cir. 2004); *United States v. Powell*, 226 F.3d 1181, 1198 (10th Cir. 2000).

Whether the exclusion of the photographs denied Solomon the right to present a defense implicates important constitutional guarantees. *See Taylor v. Illinois*, 484 U.S. 400, 408 (1988) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense.") (citation omitted). The

-11-

right to present a defense arises under the Fifth and Fourteenth Amendment right to due process and the Sixth Amendment right to compulsory process. *Richmond v. Embry*, 122 F.3d 866, 871 (10th Cir. 1997). As we have frequently stated, however, the right to present a defense is not without limits. *See, e.g., United States v. Martinez-Morel*, 118 F.3d 710, 715 (10th Cir. 1997). The defendant's presentation of evidence is constrained by the twin prongs of relevancy and materiality. Simply stated, a criminal defendant does not have a constitutional right to present evidence that is not relevant and not material to his defense. *See id.* (citing *Washington v. Texas*, 388 U.S. 14, 16 (1967); *Roviaro v. United States*, 353 U.S. 53, 63 (1957); *United States v. Begay*, 937 F.2d 515, 523 (10th Cir. 1991)).

Furthermore, in presenting evidence the defendant must "comply with established rules of evidence and procedure . . . to assure both fairness and reliability in the ascertainment of guilt and innocence." *Richmond*, 122 F.3d at 871–72 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). While the trial court "may not apply a rule of evidence mechanistically to defeat the ends of justice, in appropriate circumstances, the defendant's right to present relevant testimony may 'bow to accommodate other legitimate interests in the criminal trial process.'" *Id.* at 872 (quoting *Michigan v. Lucas*, 500 U.S. 145, 149 (1991)). In addition, the defendant must show that the exclusion of evidence rendered his

trial fundamentally unfair, i.e., that the exclusion of evidence "fatally infected the trial" and "necessarily prevent[ed] a fair trial." *Id.* (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 872 (1982)). "It is the materiality of the excluded evidence to the presentation of the defense that determines whether a petitioner has been deprived of a fundamentally fair trial." *Maes v. Thomas*, 46 F.3d 979, 987 (10th Cir. 1995).

During a bench conference, Solomon's counsel explained that he intended to introduce the photographs as evidence of Solomon's state of mind. The court, however, found that defense witnesses had already established that Solomon had been seriously injured during the assault, and therefore the addition of the photographs was merely cumulative evidence not probative to the elements of the charged offenses. R.O.A., VII at 173–74. In short, having allowed testimony of the assault that went to Solomon's state of mind, the court declined to admit the photographs: "We've established the degree of the beating for what you're talking about. Now we're talking about the play-by-play." *Id.* at 174.

Having reviewed the trial transcript, we find that the district court did not abuse its discretion in excluding the photographs. Although evidence of the assault was somewhat relevant to Solomon's state of mind, the photographs themselves were merely cumulative of live-witness testimony that had already established Solomon had been assaulted and remained fearful of another attack.

-13-

*See* Fed. R. Evid. 403 (testimony is properly excluded where it amounts to "needless presentation of cumulative evidence").

Even if we were to find that the district court erred in excluding the photographs, Solomon still cannot show that they were material to his defense. *See Valenzuela-Bernal*, 458 U.S. at 868 (evidence is material if its suppression might have affected the trial's outcome). Three of Solomon's four witnesses testified about the assault and Solomon's resulting fear. Solomon's grandmother, father, and close friend all testified that Solomon's behavior changed dramatically following the assault. R.O.A., VI at 177, 187–89, 201–02. These witnesses all testified that whereas Solomon was outgoing and upbeat prior to the assault, after the assault he became fearful and reclusive (thus supporting Solomon's trial theory that he carried the firearm for self-defense, not for drug trafficking purposes). Thus, on this record, there is simply no indication that the photographs materially advanced Solomon's defense. Indeed, in light of our previous discussion regarding the cumulative nature of the photographs, the lack of materiality is obvious.[3] *See Young v. Workman*, 383 F.3d 1233, 1238 (10th

---

[3] As noted, in order for Solomon to prevail on his constitutional claim, he must show that the exclusion of the photographs rendered his trial fundamentally unfair. *Richmond*, 122 F.3d at 872; *Young*, 383 F.3d at 1238. Because we have held that the photographs were not material to his defense, we hold also that he has not been denied a fundamentally fair trial.

-14-

Cir. 2004) (holding that the exclusion of cumulative evidence did not materially impact defendant's right to present a defense).

In sum, the district court did not abuse its discretion in excluding the photographs. As recognized by the district court, the photographs were merely cumulative of live-witness testimony. The Constitution does not guarantee Solomon the unfettered right to present such evidence. We therefore hold that the exclusion of the photographs did not violate Solomon's right to present a defense.

## C. Cumulative Error

Solomon's final argument is that he was denied his due process right to fundamental fairness through the combined effect of (1) the admission of the driver's out-of-court statements into evidence and (2) the exclusion of the photographs. We deal with this contention only briefly.

"As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." *Lisenba v. California*, 314 U.S. 219, 236 (1941). Because we have held that (1) the erroneous admission of the driver's statements was harmless and (2) the exclusion of the photographs did not deny Solomon the right to present a defense, we also hold that the combination of these alleged errors did

not render the trial fundamentally unfair. *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) ("A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.").

## III.  CONCLUSION

For the above stated reasons, we find that Solomon has not been denied any of his constitutional rights, and we therefore AFFIRM.